J-S22013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: H.G. AND J.G., MINOR CHILDREN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| APPEAL OF: LYCOMING COUNTY CHILDREN AND YOUTH | |
| | No. 2014 MDA 2016 |

Appeal from the Order Entered October 20, 2016
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 6520

BEFORE:  SHOGAN, MOULTON, and PLATT,* JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MAY 11, 2017**

Lycoming County Children and Youth Services ("the Agency") appeals from the October 20, 2016 order denying its petition for the involuntary termination of parental rights of K.D. ("Mother") and P.G. ("Father") to their sons, H.G., born in May of 2007, and J.G., born in October of 2008 (collectively, "the Children").  Upon careful review, we reverse and remand.

On September 12, 2016, the Agency filed a petition for the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  The orphans' court conducted a hearing

_____

* Retired Senior Judge assigned to the Superior Court.

on October 6, 2016,[1] at which time H.G. was nine years old and in the fourth grade. J.G. was nearly eight years old and in the second grade.

In its opinion accompanying the subject order, the orphans' court set forth its factual findings, which the testimonial evidence supports.[2] Orphans' Court Opinion, 10/20/16, at 1–12. As such, we adopt them herein.

By way of background, the Agency opened in-home services for Mother and the Children in 2014 due to their transient housing and the Children's school truancy. Orphans' Court Opinion, 10/20/16, at 2. In August of 2015, after Mother become homeless, the Agency made an unsuccessful attempt to locate Father. *Id.*; N.T., 10/6/16, at 80, 117, 124. On September 6, 2015, Mother voluntarily placed the Children in the

---

[1] The notes of testimony from the termination hearing consist of two separate transcripts, the second of which includes additional testimony of the Agency caseworker, Jacqueline Hummer, and Father. We designate this transcript as "N.T., 10/6/16 (Part 2)."

[2] During the hearing, Mother was represented by counsel, but Mother, without explanation, failed to attend. Father testified on his own behalf *via* telephone from the State of New York, where he was then residing in a supportive living residence for substance abuse treatment. The Agency presented the testimony of the following witnesses: Rhonda Jennings, assistant director at Saving Grace homeless shelter; Steve Salvatori, counselor and intake worker at Genesis House; Tammy Bradley, the Agency outreach worker; Laurel Spencer, executive director at family life services at Diakon; Karen Schooley, visitation caseworker; Jacqueline Hummer, the Agency caseworker; and Bruce Anderson, licensed psychologist at Lycoming/Clinton Joinder Board.

Agency's custody.[3]  Orphans' Court Opinion, 10/20/16, at 3.  The orphans'

court adjudicated them dependent on October 6, 2015.  *Id.*

The Agency established permanency goals of reunification for the

Children.  Mother was required to secure stable housing; follow through on

recommendations for drug and alcohol counseling; provide proof of

employment; attend medical appointments for the Children; and participate

in visits with the Children.  N.T., 10/6/16, at 125, 130–133.

Following additional searches for Father, the Agency made contact with

him on January 27, 2016, by telephone, from the State of New York.  N.T.,

10/6/16, at 73, 117.  The Agency spoke to Father again by telephone on

February 12, 2016, June 29, 2016, and July 5, 2016.  *Id.* at 74–75.  During

the conversation in June, Father advised he was residing in a halfway house

in New York.  *Id.*  In addition, the Agency communicated with Father in

writing on multiple occasions.  *Id.* at 76, 119.  In total, Father had three

different residences from the time the Agency located him through the time

of the subject proceedings, but none was suitable for the Children.  *Id.* at

121–122.  At the time of the subject proceedings, Father had not seen the

---

[3] In addition, Mother voluntarily placed her two daughters, who are the Children's younger half-sisters.  N.T., 10/6/16, at 46.  The Agency's caseworker, Ms. Hummer, testified, "services were discontinued [with respect to Mother's daughters] due to [their] father obtaining custody." N.T., 10/6/16 (Part 2), at 3.  As such, Mother's daughters are not subjects of this appeal.

Children since April of 2009, when J.G. was six months old, and H.G. was nearly two years old. N.T., 10/6/16 (Part 2), at 34.

For approximately the first month of their placement, the Children resided together in a foster home. In October of 2015, the Agency placed them in kinship care with their maternal grandfather and his wife. N.T., 10/6/16, at 124-125; N.T., 10/6/16 (Part 2), at 13. On July 7, 2016, three months before the subject proceedings, the Children were removed from kinship care to their current "foster-to-adopt" home. N.T., 10/6/16, at 7; N.T., 10/6/16 (Part 2), at 13. It is undisputed that the Children's current foster parents were then considering adopting them, but had not yet committed to doing so.

From the time of their placement in September of 2015, until April 11, 2016, the Agency provided Mother visits with the Children four times per week for two hours. N.T., 10/6/16, at 46, 50. Because of Mother's inconsistent attendance, the visits were reduced to two times per week. *Id.* at 51. On September 7, 2016, the visits were reduced to one time per week due to Mother's inconsistent attendance, which the court found had a detrimental effect on the Children. *Id.* at 51–52.

At the conclusion of the testimonial evidence, the parties, through counsel, and the Guardian *ad Litem* ("GAL") made closing arguments on the record in open court. N.T., 10/6/16 (Part 2), at 40–56. The GAL agreed with the Agency that Father's parental rights should be terminated pursuant

to 23 Pa.C.S. § 2511(a) and (b). *Id.* at 54. With respect to Mother, the GAL agreed with the Agency that Mother's conduct warranted termination pursuant to 23 Pa.C.S. § 2511(a). *Id.* at 56. The GAL disagreed that Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(b). *Id.* at 54–57.

By opinion and order filed October 20, 2016, the orphans' court denied the petition for the involuntary termination of Mother's and Father's parental rights. In doing so, with respect to 23 Pa.C.S. § 2511(a)(1) and (2), the court concluded that the Agency demonstrated that the conduct of Mother and Father warranted termination. Orphans' Opinion, 10/20/16, at 13–18. With respect to 23 Pa.C.S. § 2511(a)(5) and (8), the orphans' court concluded that the Agency demonstrated all of the elements as applied to Mother, with the exception that terminating her parental rights best served the needs and welfare of the Children. *Id.* at 21. The orphans' court opined that the Agency demonstrated all of the elements of 23 Pa.C.S. § 2511(a)(5) and (8) as applied to Father. *Id.* at 26, ¶ 3.

Regarding 23 Pa.C.S. § 2511(b), the orphans' court ruled that the Agency did not satisfy its burden of proof for the involuntary termination of Mother's parental rights. Trial Court Opinion, 10/20/16, at 22–25. The orphans' court determined that the Agency satisfied its burden of proof with respect to Father pursuant to Section 2511(b). However, the orphans' court denied the Agency's request to involuntarily terminate Father's parental

rights "unless and until the parental rights of [Mother] are also terminated." *Id.* at 27, ¶ 5.

The Agency timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b). In compliance with Rule 1925(a), the orphans' court referred this Court to its opinion accompanying the subject order. Orphans' Court Opinion, 12/21/16 (citing Orphans' Court Opinion 10/20/16).

On appeal, the Agency presents the following issues for our review:

1. The [orphans'] court abused its discretion and/or erred as a matter of law when it found that the Agency . . . did not establish by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Children . . . at this time pursuant to 23 Pa.C.S.A. § 2511(a)(5).

2. The [orphans'] court abused its discretion and/or erred as a matter of law when it found that the Agency . . . did not establish by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Children . . . at this time pursuant to 23 Pa.C.S.A. § 2511(a)(8).

3. The [orphans'] court abused its discretion and/or erred as a matter of law when it found that the Agency . . . did not establish by clear and convincing evidence that the developmental, physical and emotional needs and welfare of the Children . . . will best be served by termination of Mother's parental rights at this time pursuant to 23 Pa.C.S.A. § 2511(b).

4. The [orphans'] court abused its discretion and/or erred as a matter of law when it declined to terminate the parental rights of the father . . . unless and until the Mother's parental rights are also terminated.

Agency's Brief at 3 (full capitalization omitted).[4]

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):

_____

[4] The Pennsylvania Rules of Appellate Procedure regarding the content of briefs provide, "Each question shall be followed by an answer stating simply whether the court . . . agreed, disagreed, did not answer, or did not address the question. . . ." Pa.R.A.P. 2116(a). In its appellate brief, the Agency's statement of questions involved is deficient in that it consists of declaratory sentences that cannot be followed by answers.

- 7 -

determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The relevant provisions of section 2511 are as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> * * *

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm an involuntary termination order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In this case, the Agency states that the orphans' court correctly concluded that Mother's and Father's conduct warrants termination pursuant to Section 2511(a)(1) and (2). Agency's Brief at 10; Orphans' Court Opinion, 10/20/16, at 15–16, 18. Indeed, upon review, we conclude that the evidence overwhelmingly supports the decision of the orphans' court pursuant to those subsections. As such, we need not review the Agency's

first and second issues, which involve the court's decision regarding Section 2511(a)(5) and (8).

In its third issue on appeal, the Agency argues that the orphans' court abused its discretion and/or committed an error of law in failing to involuntarily terminate Mother's parental rights pursuant to Section 2511(b).[5] Specifically, the Agency argues that the orphans' court erred in concluding that terminating Mother's parental rights would not serve the needs and welfare of the Children because their foster parents "have not made a firm commitment to adopt" them. Agency's Brief at 10; Orphans' Court Opinion, 10/20/16, at 25. Upon review, we are constrained to agree.

With respect to Section 2511(b), this Court has stated that trial courts "must ... discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). We have further explained as follows:

_____

[5]   We note that the Agency's argument fails to comply with the rule of appellate procedure that provides as follows:

> The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type of distinctively displayed -- the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119.  The Agency's argument consists of four pages with one heading and is not divided into any parts.  Because this violation does not hamper our review, we shall consider the merits of the Agency's arguments.

- 10 -

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533–536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

in addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In *In re T.S.M.*, our Supreme Court recognized that:

the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies. . . : "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

*In re T.S.M.*, 71 A.3d at 268. Further, the *T.S.M.* Court recognized that

"termination may improve the likelihood of finding an adoptive home.

Indeed, in some cases, a child's bond with a parent, who has proven

incapable of caring for the child, may impede the child's ability to attach to a

- 11 -

pre-adoptive family who can provide the needed care and stability." *Id.* (citations omitted). In addition, the *T.S.M.* Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

The *T.S.M.* Court reversed this Court's decision that affirmed the trial court's order denying the involuntary termination of the mother's parental rights. In that case, the record evidence revealed that the mother's five children had unhealthy emotional bonds with her. Further, the children had behavioral problems. At the time of the termination hearing, only one of the children had a committed pre-adoptive placement. The remaining children had foster parents who were willing only to consider adoption. In reversing, our Supreme Court concluded, "[T]he denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children." *In re T.S.M.*, 71 A.3d at 270. The Court held as follows:

> In relying upon the mere existence of the bond between [m]other and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with [m]other, especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with [m]other

permanently, in order to permit them to be placed forthwith into healthy, permanent homes.

*Id.* at 271.

Turning to the merits of the Agency's third issue, the orphans' court found as follows in its opinion accompanying the subject order:

> Mother has cooperated on a fairly limited basis with the Agency, and has done very little work towards reunification with her children through the Agency. At the present time, the [c]ourt holds very little confidence in Mother that she will, in the future, cooperate with the Agency to maintain stable housing and employment and maintain consistent contact with the [C]hildren. Additionally, the [c]ourt has significant concerns that Mother will continue to struggle with addiction issues and not be open to formal out-patient treatment and counseling. . . .

Orphans' Court Opinion, 10/20/16, at 20. Nevertheless, the orphans' court concluded that the Agency did not prove by clear and convincing evidence that terminating Mother's parental rights would best serve the Children's needs and welfare. *Id.* at 25. In doing so, the orphans' court relied on the testimony of Bruce Anderson, M.A., licensed psychologist. The orphans' court opined:

> Mr. Anderson noted that, should Mother's parental rights be terminated, the [C]hildren will experience a period of mourning and sadness. However, he felt that they should be able to recover emotionally from that *as long as they are living in a stable and loving home environment*. While the [C]hildren appear to be adjusting well in their current resource home, and the resource parents are working on getting the [C]hildren more active and involved in therapies and services to control their behavior, they have not fully committed at this time to adopting the [C]hildren. This [c]ourt has serious concerns about terminating Mother's parental rights when there is no permanent option for the [C]hildren to be transitioned into immediately.

*Id.* at 23–24 (emphasis in original).

To the extent that the orphans' court denied the Agency's request to terminate Mother's parental rights pursuant to Section 2511(b) because the Children's foster parents had not yet committed to adoption, we conclude that the court committed an error of law. *See* 23 Pa.C.S. § 2512(b) ("If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists"); *In re T.S.M.*, 71 A.3d at 268. In addition, for the reasons that follow, we conclude that the orphans' court abused its discretion in failing to terminate Mother's parental rights pursuant to Section 2511(b).

Mr. Anderson testified that the Agency first retained him with respect to this family in May of 2014, when the Children were in Mother's custody and the Agency was providing in-home services. N.T., 10/6/16, at 86. Specifically, at that time, the Agency requested that he perform a psychological evaluation of the younger child, J.G., who was five years old and in kindergarten. Mr. Anderson testified that J.G. "was exhibiting pretty significant behavior problems and the evaluation was requested to generate recommendations for treatment. . . ." *Id.* Mr. Anderson diagnosed J.G. with disruptive behavior disorder, and he recommended "wrap-around therapeutic services" for J.G. *Id.* at 86–87.

Mr. Anderson performed a second evaluation of J.G. on November 5, 2015, at which time he was in kinship care, and his behavioral problems

continued both at home and in school. J.G. was in first grade and behind academically. N.T., 10/6/16, at 88. Mr. Anderson diagnosed J.G. with oppositional defiant disorder and again recommended wrap-around therapeutic services. *Id.*

On April 18, 2016, Mr. Anderson conducted a psychological evaluation of H.G., at which time he was in kinship care along with J.G. Mr. Anderson recommended outpatient counseling for H.G., which he testified was less intensive than the wrap-around therapeutic services recommended for J.G. N.T., 10/6/16, at 91. Finally, Mr. Anderson performed a psychological evaluation of both H.G. and J.G. on August 15, 2016, less than two months before the subject proceedings. The purpose of the evaluation was to determine "what kind of a bond does exist between the boys and [Mother]." *Id.* at 92–93. Mr. Anderson determined that "[t]he boys clearly are still emotionally bonded to the Mother." *Id.* at 93. Further, he testified on direct examination as follows:

> Q. Did you come to a conclusion as to what affect [sic] it would have on [J.G.] and [H.G.] if Mother's parental rights were terminated?
>
> A. Yes. . . . [T]here will be a grieving process that they will need to be helped through. I believe they will be able to overcome that with living in the proper home with the kind of nurturance and care that they should get if they [are to] get past that pain and go on and be stable people in the future. So . . . they'll have some pain, but I believe they will be able to get through it.

*Id.* at 96. Mr. Anderson continued:

Q. Do you have an opinion on whether or not the termination of the parental rights of [Mother] . . . is in [the] best interest and welfare [of the Children]?

A. Yes. . . . The boys need a permanent home so that they can begin to stabilize, emotionally feel more secure that this is my forever home, and I don't have to keep worrying about who's going to care for me next year, who's going to care for me next month. Am I going to have to move again? Do I have to change schools again? All those stressful things that happen when kids come in and out of care and return to natural parents and go back [into] care, those kinds of concerns.

The boys had - - that's sort of what happened, although they've gone from Mom to grandparents . . . to foster care. I feel that they need a permanent home so I'm feeling that, yes, it's time to terminate . . . the parental rights and get the boys into a permanent home.

*Id.* at 98–99. Importantly, Mr. Anderson provided the foregoing testimony well aware that the Children's current foster parents had not yet committed to adopting them.

On cross-examination by Mother's counsel, Mr. Anderson explained that he believes the Children's "need for a permanent home overrides the pain that they may go through" in terminating Mother's parental rights. N.T., 10/6/16, at 102. With respect to the Children feeling emotional pain if Mother's parental rights are terminated, he testified that "it doesn't mean that [they are] going to stay in that grieving state the rest of [their lives]. My belief is that they can get past that." *Id.* at 103. Specifically, Mr. Anderson explained that the Children "don't have the kinds of behavior or mental health problems that are going to make it impossible for them to move on." *Id.*

- 16 -

Significantly, on cross-examination by the GAL, Mr. Anderson testified

as follows:

Q. What would be the harm in waiting [to terminate Mother's parental rights] and just letting the kids stay where they are? What harm is there in that?

A. It . . . leaves them in this sort of limbo. . . . As they begin to dream and think about their own future[s] and what they want and hope for, if you're not in a permanent home it's all sort of in this child's mind sort of blurry and their future is very unclear, and do they even have a future is another way to sort of think about it.

I feel . . . they deserve . . . to be in a permanent home that they can say, okay, this is where I'm going to live . . . until I'm ready to be independent. I can plan ahead, I'll be going to high school, I'll be going to junior high, I'll be playing this sport, the things that you do. If you don't know where you're going to live, you don't care about that stuff. You care about tomorrow and who's going to care for me[,] and those sorts of uncertainties . . . are destabilizing emotionally, my feeling is.

* * *

So I would want [the Children] to be able to attach to somebody and begin to feel like they are the people there [sic] going to depend on for the rest of their lives.

*Id.* at 106–107.

With respect to J.G.'s behavioral problems, Mr. Anderson reflected on

whether they stem from the time in his life when he was in Mother's care, as

follows:

Q. Can we say that [J.G.'s] behavioral problems and issues are connected to his upbringing?

A. [M]y sense is, yes, that he has been inconsistently parented over the years and has not been held accountable in the proper ways. And he . . . struggled in the beginning of school,

kindergarten and then in the first grade, which often means that the child didn't have the kind of . . . school readiness support at home; number[s], colors, thing[s] that parents do with their children preparing them to go to school someday. . . .

[Mother's] life was a mess. She was homeless several times so she may have been busy just trying to figure out how to survive rather than worrying about whether [J.G.] knows his colors or not.

N.T., 10/6/16, at 108. Additionally, Mr. Anderson testified that J.G.'s behavioral problems can be overcome:

Q. Can [J.G.]'s issues be resolved? In other words can he grow out of them? Can he . . . become a different kind of person?

A. Absolutely, yes. Yes. I've seen it happen many times.

Q. And you say that if he's in a nurturing and loving and stable home?

A. Yeah, that's at the base. You have to start with that and then begin to work on the behaviors that he's going to continue to exhibit[] even if he's in a very stable home. . . .

*Id.* at 109. According to Mr. Anderson, "the longer that we just leave [the Children] in limbo . . . surely [J.G.]'s instability will continue and will probably get worse. And my feeling is [H.G.]'s in the same boat, but maybe not as bad as [J.G.]." *Id.* at 107.

Based on Mr. Anderson's testimony, reviewed in light of the entirety of the certified record and the applicable law, we conclude that the decision of the orphans' court not to terminate Mother's parental rights pursuant to Section 2511(b) is manifestly unreasonable. Indeed, the decision of the orphans' court places the Children "in limbo," and decreases the possibility

- 18 -

of them being placed in a healthy, permanent home, to the detriment of their developmental, physical, and emotional needs and welfare. As such, we conclude that the orphans' court abused its discretion in failing to terminate Mother's parental rights. *See In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) ("[A] parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment.").

In its fourth and final issue, the Agency argues that the orphans' court abused its discretion and/or committed an error of law by denying its request for the involuntary termination of Father's parental rights "unless and until the parental rights of Mother are also terminated." Agency's Brief at 13. We agree.

> Our Supreme Court long ago held:
>
> Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either. When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently.

*In re Burns*, 379 A.2d 535, 541 (Pa. 1977); *see also In re C.W.U., Jr.*, 33 A.3d 1 (Pa. Super. 2011) (reversing the decree denying the termination of the father's parental rights when it was based solely on the mother's parental rights not being terminated).

In this case, as described above, the orphans' court concluded that the Agency met its burden of proof pursuant to Section 2511(a) and (b) with respect to Father. Therefore, we conclude that the court committed an error of law in failing to terminate his parental rights.

Based on the record and relevant law, we are compelled to reverse the order of the orphans' court denying the involuntary termination of Mother's and Father's parental rights. Moreover, we direct the orphans' court to enter orders terminating Mother's and Father's parental rights to H.G. and J.G.

Order reversed. Case remanded for proceedings consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/11/2017